UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SHANNON V. PLAISANCE                                            CIVIL ACTION

VERSUS                                                                      NO. 07-8242

MICHAEL J. ASTRUE, COMMISSIONER                    SECTION "I" (2)
OF SOCIAL SECURITY ADMINISTRATION


**FINDINGS AND RECOMMENDATION**

Plaintiff, Shannon V. Plaisance,[1] seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Act.  42 U.S.C. §§ 405(g), 1381a.  This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

As ordered, plaintiff filed a timely Memorandum of Facts and Law.  Record Doc. No. 16.  Defendant filed a timely reply memorandum.  Record Doc. No. 18.

---

[1]Plaintiff's counsel violated this court's General Order issuing its Notice Concerning Personal Data Identifiers dated April 9, 2003 (Rule 12 of this court's Administrative Procedures for Electronic Case Filing) by including plaintiff's personal data identifier in her memorandum.  Counsel is instructed to comply with Rule 12 in the future.

I.    PROCEDURAL HISTORY

Plaisance filed an application for SSI with a protective filing date of May 19, 2005, alleging disability since July 3, 2002 due to acute asthma, depression and arthritis. (Tr. 48-50, 69, 73).  "Claimants applying to the SSI program may <u>not</u> receive payments for a period predating the month in which they apply for benefits."  <u>Rosetti v. Shalala</u>, 12 F.3d 1216, 1224 n.20 (3d Cir. 1993) (citing 20 C.F.R. § 416.335) (emphasis added); <u>accord</u> <u>Brown v. Apfel</u>, 192 F.3d 492, 495 n.1 (5th Cir. 1999).  "Thus, the month following an application . . . fixes the earliest date from which benefits can be paid." <u>Hector v. Barnhart</u>, 337 F. Supp.2d 905, 910 (S.D. Tex. 2004) (citing 20 C.F.R. § 416.335; <u>Brown</u>, 192 F.3d at 495 n.1).  Therefore, the relevant time period for any period of disability is May 19, 2005 through the date of the ALJ's decision.

After her application was denied, plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on April 12, 2007.  (Tr. 244-63).  On May 15, 2007, the ALJ issued a decision denying plaintiff's application.  (Tr. 11-20). After the Appeals Council denied review on September 11, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 4-6).

II.   STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.   The ALJ erred by failing to consider all of plaintiff's physical and mental impairments and her documented diagnoses in determining her residual functional capacity.

III.   ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.   Plaintiff has severe impairments of asthma and depression, which do not meet or equal any listed impairments found at 20 CFR, Part 404, Subpart P, Appendix 1.  Her headaches are non-severe.

2.   Plaintiff's testimony concerning the intensity, persistence and limiting effects of her symptoms was not entirely credible or corroborated by the medical evidence.  Her demeanor at the hearing was entirely incredible.

3.   Her asthma limits her to no more than sedentary or light work with some environmental restrictions and her depression causes some moderate limitations, as stated in the opinion of state agency medical consultant Lawrence Guidry, Ph.D.

4.   Plaisance has the residual functional capacity to perform sedentary and light work with moderate limitations to exposure to dust, fumes and gases; no work around heat and humidity; no prolonged outside work; and moderate limitations on work in close proximity to co-workers or the general public.

5.   Plaintiff cannot perform her past relevant work as a cashier or factory worker.

6.   Considering her age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaisance can perform.

(Tr. 17-20).

IV.    ANALYSIS

   A.    Standards of Review

   The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393. This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000). The Commissioner, rather than the courts, must resolve conflicts in the evidence. Id.

   The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible. See Arkansas v. Oklahoma, 503 U.S. 91 (1992). Despite this court's limited function, it must scrutinize the record

4

in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI, plaintiff must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2007).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920; Perez, 415 F.3d at 461; Waters, 276 F.3d at 716; Loza, 219 F.3d at 393.[2]  The five-step

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  Id. §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  Id. §§ 404.1520(d), 416.920(d).

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If she successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [her] age, education, and work history."  Martinez, 64 F.3d at 174.

---

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  Id. §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (2007) ("Medical-Vocational Guidelines").

B.    <u>Factual Background</u>

Plaisance testified that she was 33 years old and had completed the eleventh grade.

She said she can read, write and handle money.  (Tr. 249).  She stated that she had been

going to Lafourche Mental Health Clinic ("LMHC") for about two years and that her

family practice doctor at Leonard Chabert Medical Center ("Chabert") had previously

treated her for depression.  (Tr. 248-49).  She said that her prior work experience was as

a cashier and a stocker for different employers and that she worked in a shrimp factory

when she was a teenager.  (Tr. 250-51).

Plaintiff stated that she goes to the LMHC every month, or sometimes twice a

month.  She said she sees a therapist every two months.  She testified that her doctors

have told her she has bipolar disorder with homicidal tendencies.  She understands that

to mean that she has a tendency to want to kill someone.  Plaisance testified that she had

never killed anyone, but that she had tried to kill her husband a few times, long before

she learned that he was stealing things out of their house to pay for his cocaine habit.

She said that her homicidal thoughts were primarily directed toward her husband, but that

she also had difficulty getting along with other people.  She stated that she had been fired

from her last two jobs for physically fighting, so that the police were called.  (Tr. 251-

52).

Plaisance said she has chronic obstructive pulmonary disorder, which means that her lungs are constantly filled with mucus and she has to take daily breathing treatments with a nebulizer and also use an inhaler.  (Tr. 252-53).  She stated that she does not go outside when the weather is hot because she cannot breathe.  She testified that she has been told to avoid temperature extremes, smoke and gases.  She said the nebulizer is a machine into which she inserts a tube of medicine, turns it on and then inhales the medicine.  She said it takes about 30 minutes for a full treatment.  (Tr. 253).

Plaisance testified that the machine is not portable and has to be sanitized after each use.  She stated that the treatments help her breathe by keeping her lungs open.  She said she usually takes a treatment in the morning, in the afternoon and at bedtime, and that she has been doing so for about ten years.

Plaintiff testified that she has asthma attacks that require her to go to the emergency room and that her last attack was just before Christmas the previous year. (Tr. 254).  She said that, when she goes to the emergency room, they usually give her intravenous epinephrine to open her bronchial tubes.  She stated that she had gone to the emergency room at Chabert for asthma attacks "at least 10, 15 times" in the past three years, and that she was hospitalized at Lady of the Sea Hospital by Dr. Crenshaw "because I almost died."  She said her treating physician for asthma was Dr. Terry Delord at Chabert.

8

Plaisance described a normal day as getting up around 10:00 or 11:00 a.m. when someone usually comes to wake her up. (Tr. 255). She said that she does not clean her house, that a friend does it for her and that her friend also cooks for her when she does not feel like cooking. She testified that she "had five miscarriages within a two-year period," which contributed to her depression. She said that she has a very hard time being around a lot of people and has difficulty getting along with co-workers. She stated that she can tolerate family up to a point, but not for very long. Plaintiff said she does not have to be reminded to take care of her personal needs, but that sometimes she has trouble taking care of herself and she has trouble remembering certain things. (Tr. 256, 258). She stated that her medication makes her very unfocused and that she has told her doctors about this. (Tr. 256). She said that her physician recently increased the dosage of her medication and wanted her to take it daily. She said the increased dosage makes her feel like a zombie and she cannot function.

Plaisance testified that she does not think she could return to work as a cashier because she was escorted out of her last job by the police. She said she does not think that she could follow instructions and function in a commercial environment even if she was limited in dealing with other people because she does not like leaving the house any more. She stated that she usually spends the day sitting in her bedroom and reading, and that she does not do any chores around the house. (Tr. 257). She testified that sometimes

9

she spends an entire day in bed.  She said she lives with her husband and has no children.

She testified that her husband is not working now because he was injured on a job.  (Tr.

258).

      C.    <u>Vocational Expert Testimony</u>

     A vocational expert, Mary Kelly, testified at the hearing.  She stated that plaintiff's

prior work as a cashier was light and semi-skilled, while a stocker job was heavy and

semi-skilled.

     The ALJ posed a hypothetical of a younger individual with a limited education

who can read, write and handle money; is exertionally limited to sedentary and light

work; is able to grasp, turn and hold and to use her fingers for precise work; is restricted

from positions that would expose her on a regular basis to dust, fumes, gases, heat and

humidity; should avoid prolonged outside work; has no limitations in her ability to

understand, remember and carry out simple instructions and to engage in a one- or two-

step process; and has moderate limitations in her abilities to work in close proximity to

co-workers and to interact with the general public.  (Tr. 259-60).  The vocational expert

testified that such an individual could not perform plaintiff's past relevant work as a

cashier or stocker.  She stated that the individual could perform work at the light level

as an office clerk, sewing machine operator, inspector or tester, and that all of these jobs

exist in significant numbers in the Louisiana and United States economies.  (Tr. 260).

Kelly testified that office clerks work in close proximity to co-workers and that there would be some interaction between them.  She stated that sewing machine operators, although they work in the same room, would have less interaction and less need to communicate with each other than office clerks.  (Tr. 261).

Upon cross-examination by plaintiff's attorney, Kelly testified that all of the jobs would be eliminated if the side effects of the individual's medications severely impaired her from being able to follow and carry out instructions.  (Tr. 262).

D.    Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 17-19).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.    Plaintiff's Appeal

Plaintiff argues that the ALJ erred by failing to consider all of her physical and mental impairments and her documented diagnoses.  The period during which she could qualify for SSI benefits begins on May 19, 2005, the date of her application.  Because she must prove a physical or mental impairment that has lasted or can be expected to last for at least twelve months, her medical records from the year preceding May 19, 2005 are relevant.

The ALJ found that Plaisance has severe impairments of asthma and depression. In finding that her symptoms were not as severe as she alleged, the ALJ stated that the records of plaintiff's mental health treatment "show a lot of situational stressors, but little discussion of depression and no signs of psychosis." (Tr. 19).  Plaintiff argues that this statement is incorrect because her treating psychiatrist diagnosed a "major depressive disorder, recurrent, severe, with psychotic features" (Tr. 226) (emphasis added), and assessed a Global Assessment of Functioning Scale ("GAF") score of 50, and because other mental health specialists who examined or evaluated Plaisance supported that diagnosis.

The "mere diagnosis of a mental impairment (such as depression) does not establish a claimant's disability claims."  Martin v. Chater, No. 95 C 0245, 1995 WL 505955, at *6 (N.D. Ill. Aug. 23, 1995) (citing Anderson v. Sullivan, 925 F.2d 220, 222 (7th Cir. 1991)); accord Harris v. Barnhart, No. 02-55540, 2003 WL 21054733, at *2 (9th Cir. 2003); Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998); Jones v. Sullivan, 954 F.2d 125, 128 (3d Cir. 1991); Arroyo v. Secretary of Health & Human Servs., 932 F.2d 82, 87-88 (1st Cir. 1991); Hames v. Heckler, 707 F.2d 162, 165 (5th Cir. 1983).  Plaintiff "must show that she was so functionally impaired by her [diagnosed impairment] that she was precluded from engaging in any substantial gainful activity."  Id. (emphasis added); accord Anthony v. Sullivan, 954 F.2d 289, 293 (5th Cir. 1992).

Substantial evidence supports the ALJ's conclusion that plaintiff was moderately, not severely, impaired by her depressive disorder during the relevant time period. Although her treating physicians had prescribed Klonopin[3] for anxiety since at least December 2002 and Effexor[4] for depression since at least July 2004 (Tr. 108, 120), Plaisance did not seek treatment from any mental health professional until December 20, 2005, seven months after she applied for SSI benefits.  On that date, she presented to LMHC for screening, reported homicidal ideation toward her husband, was accepted as a patient and scheduled for intake appointments.  (Tr. 243).

On November 1, 2005, a consultative examining psychologist, Scuddy F. Fontenelle, III, Ph.D., diagnosed plaintiff with major depressive disorder and a personality disorder, not otherwise specified, and assessed her current GAF score as 50. (Tr. 162).  Plaintiff's treating psychiatrist at LMHC, D. Parsa, M.D., gave her the same GAF score of 50 during her initial psychiatric evaluation three months later (Tr. 237),

---

[3]Klonopin (generic name: clonazepam) "is used alone or along with other medications to treat convulsive disorders such as epilepsy.  It is also prescribed for panic disorder—unexpected attacks of overwhelming panic accompanied by fear of recurrence." PDRhealth, avail. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Klo1214.html&contentName=Klonopin&contentId=291.

[4]Effexor (generic name: Venlafaxine hydrochloride) "is prescribed for the treatment of depression—that is, a continuing depression that interferes with daily functioning." Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Eff1153.html&contentName=Effexor&contentId=198.

and the same score was repeated in the LMHC treatment plan on August 11, 2006 as both

her current score and her highest score during the past year.  (Tr. 226, 229).

Although a GAF score of 50 indicates serious symptoms, a GAF score is not

determinative of disability.

> The GAF is a subjective determination based on a
> scale of 100 to 1 of "the clinician's judgment of the
> individual's overall level of functioning."  A GAF score of
> 51-60 indicates "moderate symptoms," such as a flat affect,
> or "moderate difficulty in social or occupational functioning."
> A GAF score of 41-50 indicates "[s]erious symptoms . . . [or]
> serious impairment in social, occupational, or school
> functioning," such as inability to keep a job.

Langley v. Barnhart, 373 F.3d 1116, 1122 n.3 (10th Cir. 2004) (quoting American

Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32, 34

(Text Revision 4th ed. 2000)).

"Standing alone, a low GAF score does not necessarily evidence an impairment

seriously interfering with a claimant's ability to work.  The claimant's impairment, for

example, might lie solely within the social, rather than the occupational, sphere.  A GAF

score of fifty or less, however, does suggest an inability to keep a job."  Lee v. Barnhart,

117 Fed. Appx. 674, 2004 WL 2810224, at *3 (10th Cir. Dec. 8, 2004) (citations

omitted).

In addition, no

statutory, regulatory or other authority requir[es] the ALJ to put stock in a
GAF score in the first place.  If other substantial evidence (such as the
extent of the claimant's daily activities) supports the conclusion that she is
not disabled, the court may not disturb the denial of benefits to a claimant
whose GAF score is as low as [40-45] or even lower.

     [E]ven if the ALJ placed some weight on [plaintiff's] GAF scores,
any tendency they had to suggest that [plaintiff] could not work was
countered by the vocational expert's testimony that someone with her
limitations could still do certain widely available work.

Kornecky v. Commissioner of Soc. Sec., 167 Fed. Appx. 496, 2006 WL 305648, at

*13-14 (6th Cir. 2006) (citing Jones v. Commissioner of Soc. Sec., 336 F.3d 469 (6th Cir.

2003); Howard v. Commissioner of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)).

     In the instant case, Dr. Parsa performed a comprehensive psychiatric evaluation

on February 15, 2006.  Plaintiff sought treatment for depression and anger, which she

reported having since childhood.  Plaisance told Dr. Parsa that she had been treated with

Effexor and Klonopin by her primary care provider for three years, but that her mood had

worsened in the past year.  She stated that she had chronic thoughts of harming people

who make her angry, although she denied homicidal ideation at present.  She reported

a recent history of visual hallucinations, and Dr. Parsa observed that she was paranoid.

Dr. Parsa diagnosed "major depressive disorder, recurrent, severe, with possible

psychotic features," and assessed a GAF score of 50.  (Tr. 237) (emphasis added).  Dr.

Parsa increased plaintiff's dosage of Effexor and started her on Seroquel.[5]  One month later, D. Boudreaux, an Advanced Practice Registered Nurse ("APRN") at LMHC, observed plaintiff's continued psychotic symptoms, and the diagnosis of "major depressive disorder, recurrent, severe, with psychotic features" was confirmed.  (Tr. 242) (emphasis added).

After plaintiff had been in extended treatment with the LMHC, which included frequent counseling sessions with APRN Boudreaux and a licensed clinical psychologist, medication management and regular evaluations by Dr. Parsa, plaintiff's mood improved and she no longer experienced psychotic symptoms, such as suicidal or homicidal ideation, pulling out her hair, cutting herself or auditory or visual hallucinations.  On December 12, 2006, January 24, 2007 and March 5, 2007, plaintiff's psychiatric diagnosis changed from "major depressive disorder, recurrent, severe, with psychotic features" to "major depressive disorder, recurrent, severe, with history of psychotic features."  (Tr. 219, 221, 223, 227).

---

[5]Seroquel (generic name: quetiapine fumarate) "is prescribed for the treatment of schizophrenia, a mental disorder marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of contact with reality.  It is also used for the treatment of manic and depressive episodes associated with bipolar disorder."  Id. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Ser1402.html&contentName=Seroquel&contentId=524.

A medical condition that can reasonably be remedied by surgery, treatment or medication is not disabling.  Bolton v. Apfel, 237 F.3d 632, 2000 WL 1701816, at *1 (5th Cir. Nov. 3, 2000); Leblanc v. Chater, 83 F.3d 419, 1996 WL 197501, at *3 (5th Cir. 1996); Johnson v. Bowen, 864 F.2d 340, 348 (5th Cir. 1988); Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987); Bridges v. Massanari, No. 00-2639, 2002 WL 202221, at *3 (E.D. La. Feb. 7, 2002) (Vance, J.).  The medical records provide substantial evidence to support the ALJ's statement that plaintiff had no signs of psychosis by the date of his opinion, and that her depression had improved with treatment to the point that it imposed only the moderate limitations noted in the ALJ's opinion.

Plaisance also argues that the ALJ erred by giving "great weight" to the opinion of the state agency consultant, Lawrence Guidry, Ph.D., who reviewed her medical records and completed a functional capacity evaluation form on November 16, 2005. The ALJ's opinion adopts Dr. Guidry's findings.

Plaintiff contends that Dr. Guidry's opinion is internally inconsistent.  However, Dr. Guidry's conclusions that Plaisance could sustain attention for two-hour periods, learn from instructions and perform basic tasks and cooperate with supervision and get along with coworkers, and that she was moderately impaired mentally are not inconsistent with the six moderate limitations that he found she had in the areas of sustained concentration and persistence and social functioning.  (Tr. 186-88).  Dr.

Guidry's findings are also consistent with the entirety of the medical records, which, as discussed above, showed that Plaisance improved after she entered into regular treatment by mental health professionals from January 2006 through March 2007.

Plaintiff argues that she cannot maintain employment because she has to take breathing treatments three times a day, which last 30 minutes each time, and that the ALJ failed to take into account the combined effects of her physical ailments.  However, she cites no record evidence to support her contention that her physical impairments, which she alleges are asthma, pain in her neck and hip, migraines and arthritis, plus medication side effects, prevent her from working.

The ALJ's residual functional capacity findings included limitations to sedentary to light work and environmental restrictions to account for plaintiff's asthma, which is the only severe physical impairment that the ALJ found.  He found that her migraine headaches are not severe, and the medical records substantially support that finding. Although plaintiff experienced severe migraines in 2002 and 2003 following a concussion (Tr. 93-108), the medical records do not contain complaints of or treatment for migraines during the relevant time period.  During a consultative examination on August 16, 2005, Plaisance told internist, Gayathri Talluri, M.D., that she suffered migraines about once a month, but that she takes no medication for them.  (Tr. 151, 153).

Similarly, as she told Dr. Talluri (Tr. 150) and as she admits in her memorandum, Record Doc. No. 16-2, at p. 2, she takes no medication for pain in her back or hip. Dr. Talluri found that plaintiff had full range of motion in her spine and hips, without any muscle spasms, neurological deficits or atrophy; that her gait and posture were normal; and that she was able to get onto the examination table, walk on her heels and toes, touch her toes and squat without difficulty. (Tr. 151-52). The only treatment for pain in her back or hip during the relevant time period was on October 23, 2006, when a physician at Cut Off Family Practice diagnosed lumbar radiculopathy, ordered an MRI of plaintiff's lumbar spine and prescribed Flexeril[6] and Ultracet.[7] (Tr. 200-01). However, MRI images of plaintiff's cervical and lumbar spine on October 26, 2006 were normal. The MRI revealed sclerosis of the left femoral head, but additional imaging of the left hip was recommended to confirm the condition. (Tr. 214-16). The records of plaintiff's four

---

[6]Flexeril (generic name: cyclobenzaprine hydrochloride) "is a muscle relaxant prescribed to relieve muscle spasms resulting from injuries such as sprains, strains, or pulls. Combined with rest and physical therapy, Flexeril provides relief of muscular stiffness and pain." Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Fle1179.html&contentName=Flexeril&contentId=241.

[7]Ultracet (generic ingredients: tramadol hydrochloride, acetaminophen) "is used to treat moderate to severe pain for a period of five days or less. It contains two pain-relieving agents. Tramadol, known technically as an opioid analgesic, is a narcotic pain reliever. Acetaminophen is the active ingredient in the over-the-counter pain remedy Tylenol." Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Ult1597.html&contentName=Ultracet&contentId=607.

subsequent visits to Cut Off Family Practice contain no mention of any hip or back pain or continuation of pain medications.  (Tr. 192-99).

A claimant's lack of need for medication or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 Fed. Appx. 689, 2005 WL 1463178, at *1 (5th Cir. June 21, 2005); Anthony v. Sullivan, 954 F.2d 289,  295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa, 895 F.2d at 1024.

Concerning her asthma, Plaisance testified that she usually takes a treatment in the morning, in the afternoon and at bedtime, and that the nebulizer machine is not portable. However, no evidence in the record supports a need for lengthy breaks during the work day and at the work place to accommodate her breathing treatments.

The medical evidence does not corroborate plaintiff's testimony that she went to the emergency room at Chabert for asthma attacks at least 10 to 15 times in the past three years, and that she was hospitalized for asthma because she almost died.  The records show that she sought treatment for an asthma attack at Lady of the Sea Hospital emergency room on June 18, 2004, where she was noted to be in mild respiratory distress.  She was admitted by Dr. William Crenshaw, but she was discharged within a few hours in improved and stable condition.  (Tr. 122-27).  Her only other documented

emergency room visit was to Chabert Hospital on May 1, 2005, where she was treated and released after about three hours.  (Tr. 129-32).  Plaisance was treated for asthma and bronchitis from 2004 through 2007 at her family practitioner's office, including for acute attacks on January 2, 2006 and January 27, 2007.  (Tr. 134-39, 192-213).  She reported to Dr. Talluri on August 16, 2005 that she had not been hospitalized or visited an emergency room for asthma recently.  (Tr. 149).  Dr. Talluri performed pulmonary function tests, which revealed only a mild obstruction.  (Tr. 152-53).  The ALJ's findings concerning plaintiff's asthma are consistent with the medical records and with his finding that her testimony was not credible.

Plaisance argues that the ALJ failed to consider her arthritis in connection with whether she had fine manipulative skills, such that she could operate a sewing machine, one of the jobs that the vocational expert identified.  First, nothing in the medical records indicates that Plaisance has arthritis, or any other limitations, in her hands.  Second, she admittedly takes no medications for arthritis pain.  Dr. Talluri found that she had full range of motion and no muscle atrophy or neurological deficits in her elbows, wrists and hands.  (Tr. 150, 152).

Furthermore, the ALJ's hypothetical to the vocational expert included an ability to use her hands for precise work.  Plaintiff was represented by counsel at the hearing, and her counsel questioned the vocational expert, but did not challenge that part of the

hypothetical.  An ALJ's hypothetical question is defective and will not be allowed to stand <u>unless</u> it reasonably incorporated all of the disabilities recognized by the ALJ, "and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." <u>Bowling v. Shalala</u>, 36 F.3d 431, 436 (5th Cir. 1994).  Plaisance's attorney had such an opportunity, but did not suggest to the vocational expert any limitations in her ability to use her hands for fine manipulation.

Finally, no medical evidence documents plaintiff's complaints of debilitating medication side effects.  Dr. Parsa stated on December 12, 2006 and January 24, 2007 that she is tolerating her medications well.  (Tr. 219, 223).

Accordingly, this assignment of error lacks merit.

<u>CONCLUSION</u>

The ALJ did not err by failing to consider all of plaintiff's physical and mental impairments and her documented diagnoses in determining her residual functional capacity.  Substantial evidence supports the ALJ's findings.

## RECOMMENDATION

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __10th__ day of October, 2008.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

23